# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

ALFRED O. BONATI, et al.,

      Plaintiffs,

v.                                             Case No. 8:24-cv-0814-KKM-AAS

STATE OF FLORIDA AGENCY FOR
HEALTH CARE ADMINISTRATION,
et al.,

      Defendants.
_____

## ORDER

Defendants Rachel Beane, Tanya Ferrai, Terry Moriarty, Kimberly Smoak, and Chris Wright[1] jointly move to dismiss plaintiffs Dr. Alfred Bonati and Gulf Coast Orthopedic Center Corporation (GCOCC)'s Amended Complaint. Motion to Dismiss (Doc. 29) (MTD). For the reasons below, I grant the defendants' motion.

## I.  BACKGROUND

Plaintiff Dr. Alfred Bonati is an orthopedic surgeon who has been licensed to practice medicine in Florida since 1981.[2] Am. Compl. (Doc. 14) (FAC) ¶ 20. Around the late 1980s, Bonati began developing surgical techniques that were less invasive than the common spine surgery techniques at the time. *Id*. ¶¶ 24, 25. His techniques "either significantly reduced or eliminated the surrounding anatomical destruction, extensive rehabilitation and uncertain surgical outcomes." *Id*. ¶ 25.

---

[1] The plaintiffs listed the State of Florida Agency for Health Care Administration in the original complaint but dropped it without explanation in the First Amended Complaint. *See* Am. Compl. (Doc. 14).

[2] At this stage, I accept the complaint's factual allegations as true and construe them in the light most favorable to the plaintiff. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

Through the use of dilating tubes, surgical instruments, and local anesthesia, Bonati is able to keep patients awake and communicative during surgery, avoiding the need for general anesthesia. *Id*. ¶¶ 26, 27. Because of these techniques, Bonati could receive feedback from patients during surgery about their symptoms, "allowing him to further develop decompressive surgical techniques." *Id*. ¶ 29. Family members and caretakers could also be present during surgery. *Id*. ¶ 30. Bonati's "minimally invasive surgical technique" allows patients to return to normal activities within days. *Id*. ¶ 31.

Bonati operates GCOCC, a "physician clinical practice" (also known as The Bonati Spine Institute) in Pasco County, Florida. *Id*. ¶ 11. He also operates a licensed ambulatory surgery center called the Medical Development Corporation of Pasco County (MDC).[3] *Id*. ¶ 12. Bonati "direct[s] and control[s]" both facilities. *Id*. ¶ 34. To perform surgeries, Bonati hires and trains "surgeons and staff trained in his specific surgical technique." *Id*. ¶ 32. Patients are first evaluated at GCOCC, and then if surgery is recommended, scheduled for surgery at MDC. *Id*. ¶ 33. Bonati and GCOCC have performed nearly 80,000 surgical procedures. *Id*. ¶ 38. GCOCC's marketing consists of advertisements on Google, Facebook, and YouTube, as well as television and radio channels. *Id*. ¶ 39. More than 90 percent of GCOCC patients find GCOCC through digital marketing. *Id*. ¶ 40.

On March 8, 2023, almost all of the defendants arrived at GCOCC for an unannounced multi-day inspection of MDC. *Id*. ¶¶ 42, 47. The defendants present were Chris Wright, an Investigation Specialist II with the Florida Department of Health (DOH), and Registered Nurse Specialists Tanya Ferrai, Rachel Beane, and

---

[3] The MDC is listed as a plaintiff in both the original and amended complaints, but in the amended complaint, MDC does not bring any causes of action. *See* Am. Compl.

2

Terry Moriarty with the Florida Agency for Healthcare Administration (AHCA). *Id*. ¶¶ 14–18. These defendants stated that their inspection was prompted by "a series of confidential complaints concerning allegations of unlicensed employees of MDC conducting 'entire spine surgery.'" *Id*. ¶ 43. The defendants viewed two surgical procedures, requested and received numerous patient charts, reviewed information related to risk management, and interviewed numerous staff. *Id*. ¶ 45. Defendant Ferrai, lead investigator for AHCA, "continuously and falsely suggested that Dr. Bonati was under some form of Federal and/or criminal investigation," and warned employees that they could suffer negative consequences (such as the loss of employment) from continuing to be an employee of GCOCC or MDC. *Id*. ¶ 46.

The defendants were "relentlessly determined" to achieve their objective of suspending MDC's license to operate, and "intentionally conflated" information that they received. *Id*. ¶ 54. The defendants began contacting patients, "inquiring and demanding" information from them about financial arrangements between them, GCOCC, and MDC. *Id*. ¶¶ 50–51. The defendants represented to patients that Bonati and his staff were the subjects of a federal investigation, along with other "misrepresentations" about Bonati's fitness as a doctor and past claims of malpractice. *Id*. ¶ 52. Even after not finding evidence supporting their suspicions, the defendants "intentionally fabricated a false tale" that MDC's external risk manager had tried to stop MDC from performing entire spine surgeries. *Id*. ¶ 56.

On March 15, 2023, the AHCA issued an Emergency Suspension Order (ESO) of MDC, which suspended operations at MDC and therefore effectively shut down GCOCC as well. *Id*. ¶ 57; (Doc. 14-1) (ESO). The plaintiffs assert that the

3

ESO's findings are "fictional" because no "Certified Surgical Technologist" has ever performed an entire spine surgery at MDC. *Id*. ¶¶ 60–61. The ESO cites MDC's risk-manager's assertion that a "Certified Surgical Technologist" had performed entire spine surgeries and corroborated that finding with statements from MDC employees, including a registered nurse, operating room director, and compliance officer, who had all allegedly resigned their positions because of their concerns. *Id*. ¶¶ 61–62.

The ESO was not the end, though. The defendants allegedly "drafted the ESO with the express intent that it would be published and immediately attributed to Bonati and GCOCC," and subsequently leaked it to the media. *Id*. ¶¶ 71–72. To protect current patients from further injury and for continuity of care, GCOCC established a relationship with another ambulatory surgery center (Alternate Facility) that credentialed several GCOCC physicians and began receiving GCOCC patients for surgery. *Id*. ¶¶ 73–75. Shortly thereafter, the defendants appeared at the Alternate Facility for an inspection—specifically, to determine whether Bonati or the "certified surgical technologist" that primarily works with him on his surgical team were practicing there. *Id*. ¶ 76–77.

Without notice to Bonati or GCOCC, Lead Investigator Ferrai demanded that the Alternate Facility revoke Bonati's employees' credentials and terminate their relationship and "spine program" with Bonati. *Id*. ¶¶ 78, 91. Ferrai threatened to shut down the facility if they did not comply. *Id*. ¶ 79. Upon learning that the spine program was still in place, the defendants demanded a review of the Alternate Facility's employment and credentialing files. *Id*. ¶ 84–85. Ferrai told the Alternate Facility that Bonati was under a federal and criminal investigation and

told Bonati's patients there that Bonati had a history of malpractice claims. *Id*. ¶¶ 87, 88. On May 15, 2023, the Alternate Facility terminated their relationship with Bonati and GCOCC. *Id*. ¶ 90.

On April 3, 2023, the AHCA filed an Administrative Complaint against MDC. *Id*. ¶ 93. MDC and Bonati executed a settlement agreement on July 7, 2023, and MDC was able to resume operations. *Id*. ¶ 108. Bonati and GCOCC filed this action in April 2024 alleging substantive and procedural due process violations against all defendants (counts I through IV) and tortious interference with a business relationship against all defendants (counts V and VI). *Id*. ¶¶ 117–171.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss" for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering the motion,

5

courts accept the complaint's factual allegations as true and construe them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. 544.

### III. ANALYSIS

#### A. Counts I–IV are Barred by Qualified Immunity

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). To succeed on a qualified immunity defense, the government official must "first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Id.* The burden then shifts to the plaintiff, who must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The plaintiff's two-step burden can be considered in either order, and "an official is entitled to qualified immunity if the plaintiff fails to establish either." *Jarrard v. Sheriff of Polk*

6

*Cnty.*, 115 F.4th 1306, 1323 (11th Cir. 2024) (quoting *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019)).

An official is acting within the scope of their discretionary authority if they are "performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [their] power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Courts do not merely determine "whether it was within the defendant's authority to commit the allegedly illegal act"—courts must ask "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of [the officer's] discretionary duties." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (quoting *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997)). In other words, courts "look to the general nature of the defendant's action[s]" and "remove the constitutional taint" from the inquiry. *Holloman*, 370 F.3d at 1266.

As an initial matter, the plaintiffs fault the defendants for not robustly addressing the scope of discretionary authority prong. Resp. to MTD (Doc. 35) (Resp.) at 11. But the defendants speak to this point when they argue that "the [d]efendants' actions fell within the regulatory purview of ACHA and FDOH, and were therefore sanctioned by law," and that "[n]othing in the pleadings indicates ACHA dismissed the [ESO] due to any lack of justification for the investigation." MTD at 14. More is not necessary to preserve the issue that the defendants were acting within the scope of their discretionary power.

On the merits of the discretionary authority issue, the plaintiffs do not meaningfully refute that the defendants' conduct arose in their capacity as state officials investigating potential regulatory violations, even if the plaintiffs conceive

7

of the defendants' actions as egregious abuses of that power. The defendants began investigating MDC after receiving "a series of confidential complaints concerning allegations of unlicensed employees . . . conducting 'entire spine surgery.'" FAC ¶ 43. The defendants' actions to determine whether improper spine surgeries were occurring is "in general" "part of [their] job-related powers and responsibilities." *Holloman*, 370 F.3d at 1266 (emphasis omitted); *see* FAC ¶ 7 ("AHCA is responsible for health facility licensure, inspection, and regulatory enforcement."); *id.* ¶ 9 ("DOH is responsible for regulating health practitioners, including physicians, nurses, and other licensed healthcare providers."). The plaintiffs do not suggest that most of the means used for the investigation—watching surgical procedures, reviewing patient charts and risk management information, and interviewing staff—were outside the defendants' power to employ as "investigators." *Holloman*, 370 F.3d at 1265; FAC ¶¶ 42, 45.

The plaintiffs' view that some of the defendants' investigatory tactics amounted to an "extraordinary, malicious campaign," in particular those actions involving the Alternate Facility, does not change the analysis. Resp. at 11–12. When the "constitutional taint" is removed, the defendants' actions are investigatory tactics, which although were perhaps zealous, are still "within, or reasonably related to, the outer perimeter of [their] discretionary duties." *Harbert Int'l*, 157 F.3d at 1282. At all times, the actions of the defendants were at least "reasonably related to" enforcement and investigation. *Id*. The investigation into the Alternate Facility, as the plaintiffs allege, was to "investigate whether Dr. Bonati . . . or the certified surgical technologist that primarily works with him on his surgical team were practicing on the premises." FAC ¶ 77. The ESO speaks of

8

the "Certified Surgical Technologist" as one of the agency's primary concerns, so it is unsurprising that the defendants investigated the plaintiffs' subsequent "spine program" with the Alternative Facility. ESO ¶¶ 13–15. Therefore, the allegations show that the defendants were acting within the scope of their discretionary authority.

Next, the plaintiffs are unable to show either that the defendants violated a constitutional right or that the right was clearly established at the time of the challenged conduct. *Echols*, 913 F.3d at 1319. "Clearly established law" means the decisions of the Supreme Court of the United States, the Eleventh Circuit Court of Appeals, or the highest court of the pertinent state—in this case, the Supreme Court of Florida—that provide clear notice of the violation to the official. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007); *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000). "A right is clearly established if (1) a case with facts materially similar has been decided by the United States Supreme Court, the Eleventh Circuit, or the applicable state supreme court before the challenged conduct; (2) a broader, clearly established principle controls the facts of the situation; or (3) the conduct so obviously violates the constitution that prior case law is unnecessary." *Wade v. Daniels*, 36 F.4th 1318, 1323 (11th Cir. 2022) (citing *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)).

The plaintiffs blend the merits and clearly established prongs together, creating unnecessary confusion. But regardless, they can show neither. They allege that two "clearly established" constitutional rights were violated: the right to procedural due process and the right to pursue an occupation. Resp. at 2; FAC ¶¶ 117–57. According to the plaintiffs, the defendants violated both constitutional

9

rights by "shredding" the plaintiffs' relationship with the Alternate Facility. Resp. at 12. As for the procedural due process right, the plaintiffs beg the question—they state that the right is clearly established because it is "well-settled." *Id.* But "[p]laintiffs cannot carry their burden of proving the law to be clearly established by stating constitutional rights in general terms." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996) (citing *Dartland v. Metro. Dade Cnty.*, 866 F.2d 1321, 1323 (11th Cir. 1989)). And the plaintiffs point to no case establishing that interference with a business relationship constitutes the deprivation of procedural due process. Resp. at 23-24. On the contrary, "while interfering with a business relationship may constitute a tort, it is not a constitutional violation." *Baltimore Air Transp., Inc. v. Jackson*, 419 F. App'x. 932, 937 (11th Cir. 2011).

      Similarly, neither the plaintiffs' allegations nor citations to caselaw establish the right to purse an occupation as clearly established or violated. The plaintiffs note that a clearly established right can be established by prior precedent or in "rare cases of obvious clarity," *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1366 (11th Cir. 2024) (quoting *Brooks v. Warden*, 800 F.3d 1295, 1306)), but go on to show neither of those. Though the Supreme Court has recognized a "right to choose one's field of private employment," it is "subject to reasonable governmental regulation." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999). But the cases in which the Supreme Court recognized this generalized right involve a "complete prohibition of the right to engage in a calling." *Id*. Therefore, foreclosing one business opportunity while still allowing Bonati to maintain his license is not enough to deprive Bonati of his right to engage in a chosen occupation. *See Doe v. Fla. Bar*, 630 F.3d 1336, 1344–45 (11th Cir. 2011) (finding no constitutional violation where the

plaintiff's legal specialist certification was denied because "the full range of legal work" was still available to her). The plaintiffs' own allegations belie the point—they state that the "ability to practice was significantly altered." Resp. at 27. This is not enough.

Therefore, the plaintiffs' substantive due process and procedural due process claims are barred by qualified immunity.

### B. Counts V and VI are Barred by Sovereign Immunity

Under Florida law, "sovereign immunity is both an immunity from liability and an immunity from suit." *Fla. Highway Patrol v. Jackson*, 288 So. 3d 1179, 1185 (Fla. 2020). "Under Florida law, sovereign immunity is the rule, rather than the exception." *Town of Gulf Stream v. Palm Beach Cnty.*, 206 So. 3d 721, 725 (Fla. 4th DCA 2016). "Any waiver of sovereign immunity 'must be clear and unequivocal.'" *Id.* (quoting *Manatee Cnty. v. Town of Longboat Key*, 365 So. 2d 143, 147 (Fla. 1978)). Based on its authority under the Florida constitution, the Florida Legislature enacted § 768.28, which waives sovereign immunity with respect to tort claims "to the extent specified in this act." Fla. Stat. § 768.28(1); *Barnett v. Dep't of Fin. Servs.*, 303 So. 3d 508, 512 (Fla. 2020). Immunity is only waived for tort claims arising from "injury or loss of property, personal injury, or death caused by the negligent or wrongful act." § 768.28(1).

The plaintiffs' claims of tortious interference with a business relationship are barred by sovereign immunity under Florida law. As a threshold matter, both parties assume that § 768.28's waiver applies to the instant claim, but it does not. The tortious interference claims do not allege any "personal injury, wrongful death, or injury or loss of property" as required by § 768.28, but instead seeks

11

economic damages in the form of compensatory damages, lost profits, reputational harm, and special damages. FAC ¶¶ 164, 171. "The waiver of sovereign immunity has not been extended to include . . . economic damages framed in [a] count[] for . . . tortious interference with [an] advantageous business relationship." *City of Pembroke Pines v. Corr. Corp. of Am., Inc.*, 274 So. 3d 1105, 1113 (Fla. 4th DCA 2019); *see also County of Brevard v. Miorelli Eng'g, Inc.*, 677 So. 2d 32, 34 (Fla. 5th DCA 1996) (barring claim causing only economic damages because Florida did not waive sovereign immunity for such claims), *quashed on other grounds*, 703 So. 2d 1049 (Fla. 1997); *City of Fort Lauderdale v. Tropical Paradise Resorts, LLC*, 372 So. 3d 663, 667–68 (Fla. 4th DCA 2023) (same). Therefore, the plaintiffs' tortious interference claims are barred by sovereign immunity.

## IV. CONCLUSION

Because the plaintiffs' claims are barred by sovereign and qualified immunity, the Amended Complaint fails to state a claim that is plausible on its face and is dismissed without prejudice. *See Dupree v. Owens*, 92 F.4th 999, 1008 (11th Cir. 2024) ("Because the dismissals were based on sovereign immunity grounds, the jurisdictional nature of the dismissal requires it to be entered without prejudice.").

Accordingly, the following is **ORDERED**:

1. Defendants' Motion to Dismiss (Doc. 39) is **GRANTED.**
2. Counts I–VI are **DISMISSED WITHOUT PREJUDICE.**
3. The clerk is directed to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on December 4, 2024.

Kathryn Kimball Mizelle
United States District Judge